## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ASHLEY HUTCHINSON-HARPER and TERRY HARPER, on behalf of their minor child, J.H., | CIVIL ACTION NO.: 22-1271 |
| *Plaintiffs,* | SECTION: T |
| *v.* | DIVISION: 4 |
| JEFFERSON PARISH SCHOOL BOARD, a public entity, 501 Manhattan Blvd Harvey, LA 70058, and | JUDGE: GREG G. GUIDRY |
| | MAGISTRATE JUDGE: KAREN WELLS ROBY |
| JEFFERSON PARISH SHERIFF JOSEPH P. LOPINTO, III in his official capacity, 1233 Westbank Expressway Harvey, LA 70058, | JURY DEMAND |
| *Defendants.* | |

## SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY RELIEF, AND DAMAGES AND JURY DEMAND

Plaintiffs, ASHLEY HUTCHINSON-HARPER and TERRY HARPER, on behalf of minor child, J.H., by and through undersigned counsel, bring this action for declaratory and injunctive relief and damages against Defendants JEFFERSON PARISH SCHOOL BOARD and JEFFERSON PARISH SHERIFF JOSEPH P. LOPINTO, III, the latter in his official capacity, for violations of federal and state laws. In support of their claims, Plaintiffs respectfully represent the following:

### I.        INTRODUCTION

1.    This is a civil action seeking injunctive relief, declaratory relief, and damages from

Jefferson Parish School Board ("School Board") and Jefferson Parish Sheriff Joseph P.

Lopinto, III in his official capacity as Sheriff and final policymaker of the Jefferson Parish Sheriff's Office ("JPSO").

2.     On May 13, 2021, in the office of Karen Doyle, the principal of Congetta Trippe Janet Elementary School ("CT Janet"), J.H. began exhibiting behaviors that were a manifestation of his disabilities. These behaviors included throwing a tissue box and a ball of yarn.

3.     Doyle had actual knowledge that J.H. was a child with disabilities because she knew he had an Individualized Education Plan ("IEP") that specifically described J.H.'s disabilities; Doyle also regarded J.H. as a child with disabilities.

4.     After observing and in response to J.H.'s behavior, Doyle threatened to call J.H.'s parents to punish him for his behavior.

5.     Doyle's threat caused J.H.'s symptoms to worsen such that J.H. left the office, hit Doyle, threw a trashcan into a school window, and wandered on and off the school campus.

6.     Instead of enlisting the help of school counselors or other appropriate school officials, such as a para-educator or a special education teacher, to calm J.H. through de-escalation measures, CT Janet administrators called 911.

7.     When law enforcement officers from JPSO arrived, Officer Steven Trapani put J.H. in a chokehold, handcuffed his hands behind his back, and took J.H. to a room in the school.

8.     In that room, multiple officers interrogated J.H. for approximately an hour and a half and forced J.H. to sit on the floor with his hands cuffed painfully tight behind his back.

9.     J.H. was extremely scared, crying, and in pain from the handcuffs.

10.     J.H. refused to answer any of the officers' questions.

11.     During the questioning, Officer John Doe told J.H. he had "nice lips."

12.     The school administrators and JPSO officers did not allow J.H.'s parents to see him during this questioning.

13.     After the questioning, Officer Trapani took J.H. to a juvenile detention center; J.H. was not released to his parents until four hours later.

14.     Plaintiffs J.H., Ashley Hutchinson-Harper, and Terry Harper seek permanent injunctive relief to prohibit Defendants from arresting and authorizing or employing the unnecessary and excessive use of physical restraint and handcuffing on schoolchildren with disabilities whose behaviors are a manifestation of their disabilities, and to compel Defendants to revise their policies, practices, and training accordingly.

15.     Plaintiffs further seek an order declaring Defendants' conduct to be in violation of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act of 1973, the Louisiana State Constitution, and Louisiana's Civil Code. Plaintiffs also seek compensatory damages, punitive damages under state law claims, reasonable attorneys' fees, and court costs.

## II.     JURISDICTION AND VENUE

16.     Plaintiffs bring this action pursuant to Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, *et seq.*, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C § 794.

17.     This Court has original jurisdiction over Plaintiffs' claims of federal civil rights violations pursuant to 28 U.S.C §§ 1331, 1334(a)(3), (a)(4).

18.     This Court has supplemental jurisdiction over Plaintiffs' claims arising under the Constitution of the State of Louisiana and its laws pursuant to 28 U.S.C. § 1367 because those claims arise out of the same case or controversy as the Federal claims within this Court's original jurisdiction.

19.     Declaratory relief is authorized by 28 U.S.C § 2201. A declaration of law is necessary to determine the respective rights and duties of the parties.

20.     Venue is proper in the Eastern District of Louisiana under 28 U.S.C. § 1391(b)(2): a substantial part of the events giving rise to these claims occurred in the City of Marrero, Jefferson Parish, Louisiana, situated in the Eastern District of Louisiana.

### III.     PARTY PLAINTIFFS

21.     J.H. is a Black male, who was ten years old when JPSO officers put him in a chokehold, arrested him, pulled him to the ground, dragged him on the ground, and sat on him. At all relevant times, J.H. was enrolled at Congetta Trippe Janet Elementary School, a school belonging to the Jefferson Parish School System under the control of Jefferson Parish School Board. J.H. is currently a student in the Jefferson Parish School System. J.H. has disabilities—including Attention Deficit Hyperactivity Disorder Combined Type ("ADHD"), Oppositional Defiant Disorder ("ODD"), Mood Disorder, and Emotional Outburst—and these disabilities substantially limit one or more of his major life activities. He is a person with a disability within the meaning of the ADA and Section 504. As a minor child, J.H. brings this action through his mother and next friend, ASHLEY HUTCHINSON-HARPER as well as his father and next friend, TERRY HARPER. ASHLEY HUTCHINSON-HARPER, and TERRY HARPER are adults who reside in Marrero, Louisiana.

22.    Plaintiffs ASHLEY HUTCHINSON-HARPER and TERRY HARPER are the mother
       of and father of J.H., respectively.

### IV.    PARTY DEFENDANTS

23.    Defendant JEFFERSON PARISH SCHOOL BOARD is the school district for the
       Parish of Jefferson; is a public entity for purposes of Title II of the ADA; and receives
       federal financial assistance for purposes of Section 504 of the Rehabilitation Act.

24.    Defendant JEFFERSON PARISH SHERIFF JOSEPH P. LOPINTO, in his official
       capacity, is the chief law enforcement agency for the Parish of Jefferson; is a public
       entity for purposes of Title II of the ADA; and receives federal financial assistance for
       purposes of Section 504 of the Rehabilitation Act.

### V.    STATEMENT OF FACTS

#### A. J.H.'s History as a Student with Disabilities Requiring Special Accommodations

25.    At the time of the incident described in this Complaint, J.H. was a ten-year-old boy
       and a fifth-grade student at CT Janet.

26.    J.H. is a beloved son and brother, loyal friend, and enthusiastic student.

27.    At the time of the incident, J.H. had been diagnosed with ADHD Combined Type,
       Oppositional Defiant Disorder, Mood Disorder, and Emotional Outburst.

28.    J.H.'s disabilities make it significantly more difficult for him to manage his response
       to frustration; to control his anger; to express his emotions, wants, and needs; and to
       adjust to social and physical transitions.

29.    J.H.'s disabilities substantially limit several of his major life activities, including
       learning, thinking, concentrating, interacting with others, controlling his emotions, and
       communicating.

30.     J.H. is an individual with disabilities within the meaning of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et. seq.*

31.     Defendant School Board had knowledge that J.H. had disabilities because they were listed and described with specificity in J.H.'s IEP.

32.     J.H. is a Black male child. At the time of the incident, J.H. was 4 feet and 5 inches tall, and weighed 93 lbs.

33.     In a recent school year, 16.3% of enrolled students in CT Janet have been students with disabilities served under the IDEA and Section 504 of the Rehabilitation Act.[1]

34.     In a recent school year, 7.3% of Black students within Jefferson Parish Schools were served under Section 504.[2]

35.     Of the 1,565 students in Louisiana referred to law enforcement in 2017-18, 33% were students with disabilities, even though only 6% of enrolled students have a disability.[3]

36.     According to 2017 survey data by the U.S. Department of Education, within the Jefferson Parish School District, Black students represented 39.2% of IDEA-defined students with disabilities, but received 55.5% of in-school suspensions, 62.5% of out-of-school suspensions, 75.8% of expulsions, and 74.5% of referrals to law enforcement.[4]

---

[1] Civil Rights Data Collection, *Congetta Trippe Janet Elementary School*, https://ocrdata.ed.gov/profile/9/school/214253/summary.
[2] Civil Rights Data Collection, *Jefferson Parish*, https://ocrdata.ed.gov/profile/9/district/26784/studentswithdisabilities504.
[3] https://ocrdata.ed.gov/assets/downloads/2017-2018/School-Climate/Arrests/Referred-to-Law-Enforcement/Referred-to-Law-Enforcement_by-disability.xlsx
[4] https://ocrdata.ed.gov/profile/9/district/26784/disciplinereport?report=true

**B. The School Board's Disability-Based Discrimination against J.H. on May 13, 2021**

37.  On May 13, 2021, another student bullied, bothered, and taunted J.H. while in class.

38.  The classroom teacher allowed the other student's bullying, bothering, and taunting to escalate to the point that J.H. began breathing heavily and yelling because he was so frustrated and angry.

39.  J.H.—a child with ADHD, ODD, Mood Disorder, and Emotional Outburst—is especially sensitive to these types of interactions.

40.  The teacher failed to reprimand the other student and only reprimanded J.H., which exacerbated his feelings of anger and frustration.

41.  Immediately after this class was the lunch period.

42.  J.H. routinely eats his lunch in the school office with Doyle because he often faces bullying and difficult social interactions when eating lunch with his peers.

43.  J.H. was still extremely upset, angry, and frustrated from the incident involving the other student and teacher.

44.  J.H. took his lunch to the school office to eat.

45.  While sitting in the office, J.H. refused to eat his lunch because he was still so distraught and angry from the previous class period.

46.  Doyle and other CT Janet administrators, noticing that J.H. was not eating, demanded that he eat or else go hungry for the rest of the day.

47.  Out of further frustration with this demand and lack of sympathy, J.H. threw a ball of yarn, hand sanitizer, and a tissue box.

48. In response, Doyle and her secretary Sharona Colmer threatened to call J.H.'s mother if he did not "shape up" his behavior.

49. Neither Doyle nor Colmer asked J.H. why he was upset and angry or attempted to assuage his frustration or attempt to calm J.H. down when he was exhibiting symptoms of his disabilities.

50. Neither Doyle nor Colmer attempted to contact a school counselor to talk to and help calm J.H. when he was exhibiting symptoms of his disabilities.

51. J.H., who was further agitated by Doyle's threat to call his parents, struck Doyle.

52. Doyle did not fall to the ground nor appear to be injured.

53. The physical confrontation took place at 12:57 PM in the school office.

54. During the confrontation, there were two CT Janet administrators and one other student in the office.

55. J.H. then walked out of the office, through the school, and outside.

56. After the physical confrontation, Doyle paced around the office momentarily and spoke with other CT Janet administrators.

57. Doyle radioed on her walkie-talkie and then walked through a separate door, which leads outside the school.

58. Once outside, at 1:01 PM, J.H. picked up a trashcan and threw it at a window, breaking it. J.H. then proceeded to walk through a set of doors.

59. When J.H. threw the trashcan at the window, Doyle and three other CT Janet administrators followed J.H.

60. The school administrators could see that J.H. was experiencing symptoms of his disabilities because he was in distress, emotionally distraught, unreasonable, and non-communicative.

61. Instead of trying to calm J.H. and assuage the symptoms of his disabilities or allowing his parents to help J.H., school administrators immediately called 911.

62. In total four phone calls were made between CT Janet administrators and 911 dispatch.

63. The first call came from within the school office at 12:58:07 PM and lasted approximately one minute and 55 seconds.

64. The first call came from Colmer, who informed 911 dispatch that a student had attacked Doyle and that the student was trying to leave campus.

65. Colmer requested that dispatch send a deputy.

66. Colmer described the student as a fifth grader, African American, ten years old, and wearing a blue collared shirt, navy blue shorts, and glasses.

67. The second call to 911 dispatch occurred at 12:58:38 PM and lasted approximately two minutes and 40 seconds.

68. The second call was made by a woman named Kara Pierce.

69. Pierce told 911 dispatch that a student had attacked Doyle, and then the student took off.

70. A third call was made to 911 dispatch.

71. The third call took place at 1:04:39 PM and lasted for one minute and 29 seconds.

72. The third caller never identified themselves.

73. The caller incorrectly stated that the principal needed medical attention.

74. The caller incorrectly stated that the student punched Doyle in the jaw.

75.     The caller incorrectly stated that the student knocked Doyle to the ground.

76.     At 1:10:44 PM a fourth call was made between 911 dispatch and CT Janet. It lasted approximately 38 seconds.

77.     The fourth call was from 911 dispatch to CT Janet.

78.     The official from 911 dispatch stated that the reason for the call was that the responding police officers needed the CT Janet administrators to open the gates to let in technicians from Emergency Medical Services.

79.     During the same time period as the four calls between 911 dispatch and administrators and staff at CT Janet are occurring, there was also communication between the responding police officers and 911 dispatch over the radio.

80.     There was discussion between 911 dispatch and the responding police officers regarding the school gate needing to be open for EMS.

81.     911 dispatch also alerted the responding police officers that the student is on medication.

**C. JPSO's Disability-Based Discrimination against J.H. on May 13, 2021**

82.     Around 1:05 P.M., Sgt. Steven Trapani arrived on scene with three other officers: Deputy Gary Bavaret, Deputy Colin Dunning, and Deputy Brandon Cheron ("the officers").

83.     When the officers arrived, J.H. was walking away from the school building and did not pose a threat to himself or others.

84.     J.H. had tears streaming down his face and a blank stare. J.H. was clearly scared and upset.

85.   J.H. was disassociating, non-communicative, and clearly manifesting symptoms of his disabilities.

86.   When the officers arrived, J.H. was not in the process of committing any crime or violation of Louisiana state law.

87.   Officers Trapani, Bavaret, Dunning, and Cheron were aware that the student they would be dealing with was on medication and could see that the student was emotional and distraught.

88.   As noted above in paragraph 81, 911 dispatch had informed the responding officers that the student was on medication; that report from dispatch put the officers on notice that the student had at least one disability.

89.   Moreover, J.H.'s behavior was such that his disabilities were apparent.

90.   The officers could see that the student they were dealing with was in distress, emotionally distraught, and non-communicative.

91.   The officers knew or should have known that the behaviors exhibited by the student, J.H., were manifestations of his disabilities.

92.   Even though J.H. posed no threat and was only walking, crying, and non-communicative, the officers did not try to talk to J.H or ask him why he was upset.

93.   The officers never tried to de-escalate the situation or use other intervention techniques.

94.   The officers never spoke to the school officials about why J.H. was distraught or about his disabilities.

95.   Instead, immediately upon arrival, Sgt. Trapani forcefully grabbed J.H. by the arm and pulled J.H.'s arm behind his back.

96.    J.H. then pulled his arm away because he was scared and walked away from Sgt. Trapani.

97.    Sgt. Trapani then forcefully grabbed J.H., placed him in a chokehold, and pulled J.H. to the ground.

98.    Sgt. Trapani then dragged J.H. on the ground while he was in a chokehold.

99.    While he was in a chokehold, J.H. was fearful for his life.

100.   J.H.'s neighbor, close family friend, and mentor, Ashely Jackson, was at CT Janet when the police arrived and observed this interaction between the police and J.H.

101.   When Sgt. Trapani had J.H. in a chokehold, Ms. Jackson told Sgt. Trapani that physical restraint was not necessary to calm J.H. down.

102.   Sgt. Trapani ignored Ms. Jackson's advice and would not allow Ms. Jackson to help calm J.H.

103.   Instead, Sgt. Trapani tightly handcuffed J.H.

104.   At 1:08:55 PM, Officer John Doe radioed 911 dispatch that the student was in custody.

105.   None of the officers attempted to talk to J.H. or calm him down before deciding to place him—a ten-year-old boy—in a chokehold, and then handcuff him.

106.   None of the officers attempted to talk to school administrators about J.H. before deciding to place him—a ten-year-old boy—in a chokehold and handcuff him.

107.   None of the officers inquired about the nature and extent of J.H.'s disabilities or the fact that he was on medication.

108.   Knowing the disproportionate number of students with disabilities referred to law enforcement in Jefferson Parish, the officers' first step in responding to the 911 call,

having observed the lack of any safety threat, should have been to inquire about the nature and extent of J.H.'s disabilities.

109. At 1:09 PM, Sgt. Trapani then took J.H. into the principal's office where the officers would interrogate J.H.

110. Jackson attempted to follow J.H. and the officers into the school.

111. CT Janet administrators told Ms. Jackson that they would not allow her to go inside with him because she was not J.H.'s mother.

112. Shortly after Sgt. Trapani escorted J.H. into the school for interrogation, Ashley Hutchinson-Harper, J.H.'s mother, arrived at the school accompanied by J.H.'s paternal grandparents.

113. CT Janet administrators refused Hutchinson-Harper's request to enter the school to talk with her son.

114. Hutchinson-Harper pleaded several more times with various CT Janet administrators to be allowed to talk with her son and the responding officers, but the administrators denied her access.

115. Inside the school office, the officers made J.H. sit on the floor with his hands handcuffed painfully behind his back.

116. The officers tried to force J.H. to make a statement and were verbally abusive.

117. The officers questioned J.H. for an hour and a half.

118. J.H. was scared, terrified, confused, crying, and wanted his parents.

119. While inside the school with the officers, J.H. also complained of the handcuffs being too tight.

120. J. H. tried to stand up because he was in pain from the handcuffs.

121.   This prompted one officer to push J.H., and J.H. instinctively kicked back at him.

122.   The officers repeatedly yelled at J.H. to talk and would not allow his parents inside during the interrogation.

123.   The interrogation outside the presence of J.H.'s parents was over an hour and a half long.

124.   J.H. remained handcuffed throughout the interrogation.

125.   After the interrogation, the officers took J.H. outside and sat him on the curb so his parents and family could have a brief word with him.

126.   J.H. remained handcuffed.

127.   J.H.'s grandparents told the officers to be careful with J.H. and that arresting him was unnecessary and inappropriate because "J.H. has a condition."

128.   J.H.'s father, Terry Harper, arrived at the school while J.H. was sitting handcuffed on the curb.

129.   Mr. Harper spoke with J.H. for approximately two minutes and reassured his terrified and crying son that everything would be okay.

130.   Mr. Harper spoke with the officers, telling them that they could have tried to talk to his son and calm him down before deciding to handcuff him.

131.   The officers simply stated in reply that they "did what they had to do" to restrain J.H.

132.   Mr. Harper and Ms. Hutchinson-Harper pled with the police to allow J.H. to go home with them.

133.   Ms. Hutchinson-Harper told the officers that J.H. was only ten years old. One officer smugly replied, "He's at least 10.1 years old."

134.   J.H. was then placed in the back of a squad car and taken to the Jefferson Parish Juvenile Assessment Center.

135.   Upon arriving at the juvenile detention center, officers handcuffed J.H.'s legs and booked and processed him.

136.   J.H. was charged with two counts of battery of a police officer, one count of resisting arrest, one count of battery of a schoolteacher, and one count of simple criminal damage of less than $1000.

137.   J.H. was placed in a cell for approximately four hours.

138.   J.H. was not allowed to see his parents.

139.   J.H. was not allowed food or water.

140.   He was only allowed to use the restroom once.

141.   J.H. was only allowed to use the women's restroom.

142.   Around 6:00 P.M., J.H. was released from the Jefferson Parish Juvenile Assessment Center to his parents.

143.   His parents then took him to Children's Hospital to be evaluated.

144.   J.H. was released from the hospital that night.

145.   Plaintiffs spent $2,000 retaining a criminal defense attorney.

146.   All criminal charges against J.H. were dismissed.

147.   Because of this incident, J.H. suffers significant distress from the trauma of the incident.

148.   J.H. has heightened anxiety and becomes extremely fearful whenever he sees police officers.

149.   For instance, a couple of months following the incident on May 13, 2021, J.H. was playing basketball in his driveway. Two police cars drove by his house and he ran inside in terror.

150.   Seeing or being around police officers triggers a significant negative emotional response in J.H.

151.   J.H.'s friends and family have noticed a decrease in his demeanor, affect, and sociability because of his arrest on May 13, 2021.

152.   J.H. no longer attends CT Janet. He now attends Marrero Middle School, a school within the Jefferson Parish School System.

## VI.   CAUSES OF ACTION

**Count I:      Disability-Based Discrimination and Failure to Accommodate In Violation of Title II of the Americans With Disabilities Act, 42 U.S.C. § 12132, 28 C.F.R. § 35.130(b)(3), (8), Against JEFFERSON PARISH SCHOOL BOARD**

153.   Plaintiffs incorporate and reallege the allegations in each preceding and following paragraph of this complaint.

154.   J.H. is a "qualified individual with a disability" as defined in 42 U.S.C. § 12131(2) as he has several physical or mental impairments that require treatment and that substantially limit his major life activities, including learning, thinking, concentrating, interacting with others, controlling his emotions, and communicating.

155.   The School Board is a "public entity" as defined in 42 U.S.C. § 12131(1) and so is covered by Title II of the ADA.

156.   Title II of the ADA requires that public entities refrain from discriminating against individuals on the basis of disability.  Title II provides that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be

denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.  42 U.S.C. § 12132.

157.   Public entities must avoid unnecessary policies, practices, criteria or methods of administration that have the effect or tendency of excluding or discriminating against persons with disabilities.  28 C.F.R. § 35.130(b)(3). Further, the regulations require that public entities provide reasonable modifications to their policies, practices, or procedures in order to avoid discrimination on the basis of disability.  28 C.F.R. § 35.130(b)(7).  Reasonable modifications include positive behavioral interventions and supports, redirection, de-escalation, crisis intervention, patience, and waiting.

158.   Students with disabilities, and particularly students with disabilities with the need for behavioral supports, including J.H., are acutely susceptible to and injured by the unnecessary and inappropriate use of physical restraints, including handcuffs, on the basis of disability. The effects on J.H. include substantial and disproportionate physical and emotional injuries.

159.   Defendant School Board had actual knowledge of J.H.'s disabilities and his need for modifications to policies, practices and procedures due to those disabilities.

160.   Defendant School Board knew that J.H. was exhibiting manifestations of his disabilities and called 911 dispatch to have law enforcement apprehend and arrest him because of his disabilities.

161.   Defendant School Board elected not to practice de-escalation techniques; did not allow family or friends to speak to J.H.; and did not simply allow J.H. to calm down. Any of these actions would have been reasonable and appropriate modifications to policies,

practices and procedures that would have avoided disability discrimination in this situation.

162. Defendant School Board acted with deliberate indifference in choosing to call 911 to have J.H. apprehended and arrested.

163. Defendant School Board failed to provide reasonable modifications for J.H. such that J.H. was denied equal access to the benefits of the programs and services provided by JPSB and experienced discrimination on the basis of his disabilities.

164. Such acts and omissions noted above, taken individually and in concert with each other, rise to the level of intentional discrimination.

165. Taking into account all of the above-described circumstances, J.H. was a victim of discrimination solely based upon his disability and injured thereby.

**Count II:** **Disability-Based Discrimination and Failure to Accommodate in Violation of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132, 28 C.F.R. § 35.130(b)(7), Against JEFFERSON PARISH SHERIFF JOSEPH S. LOPINTO, in his Official Capacity**

166. Plaintiffs incorporate and reallege the allegations in each preceding and following paragraph of this complaint.

167. Jefferson Parish Sheriff Joseph P. Lopinto, III, in his official capacity as Sheriff and policymaker for the Jefferson Parish Sheriff's Office, is a "public entity" as defined in 42 U.S.C. § 12131(1) and so is covered by Title II of the ADA.

168. Title II of the ADA requires that public entities refrain from discriminating against individuals on the basis of disability.  Title II provides that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.  42 U.S.C. § 12132

169.   Under these provisions, law enforcement agencies and officers—including officers Trapani, Bavaret, Cheron, and Dunning—may not discriminate on the basis of disability and must provide reasonable modifications as needed during their interactions with individuals with disabilities.

170.   Based on all of the circumstances stated herein, Defendant Lopinto, in his official capacity, knew or should have known that J.H. is a child with disabilities who requires reasonable modifications under the ADA due to his disability-related difficulties.

171.   Defendant Lopinto, in his official capacity, knew or should have known J.H. needed reasonable modifications due to his disability when its deputies learned that he was on medication, had a condition, and observed him crying, distraught, and non-communicative.

172.   Defendant Lopinto, in his official capacity, knew or should have known that responding to a 911 call from a school that there is an elevated likelihood of interacting with a student with one or more disabilities.

173.   Defendant Lopinto, in his official capacity, acted with deliberate indifference in choosing to use force and arrest J.H.

174.   Defendant Lopinto, in his official capacity, failed to implement reasonable modifications for J.H. such that J.H. was denied access to the programs and services of CT Janet.

175.   Defendant Lopinto, in his official capacity, failed to have de-escalation procedures in place on how to intervene at a public school with a child with a disability who had known needs for behavioral supports.

176.   Defendant Lopinto, in his official capacity, violated its own mission statement in failing to augment resources and improve the quality of life of the citizens its officers protect.

177.   Defendant Lopinto, in his official capacity, failed to provide reasonable modifications for J.H.'s disabilities through their forceful and threatening interrogation of J.H. outside the presence of his parents for an hour and a half while handcuffed.

178.   Defendant Lopinto, in his official capacity, discriminated against J.H. based on his disability by choosing to arrest him rather than modifying its procedures by taking other steps commensurate with J.H's unique and individualized physical, mental, and emotional needs, many of which he was manifesting.

179.   Such acts and omissions noted above, taken individually and in concert with each other rise to the level of intentional discrimination, violating the ADA.

180.   In regard to all the above, J.H. was a victim of discrimination based upon his disability and injured thereby.

**Count III:     Disability-Based Discrimination and Failure to Accommodate in Violation of Section 504 of the Rehabilitation Act of 1973, Against All Defendants**

181.   Plaintiffs incorporate and reallege the allegations in each preceding and following paragraph of this complaint.

182.   J.H. is likewise "an individual with a disability" pursuant to Section 504 and its implementing regulations and directives. Defendants School Board and Defendant Lopinto, in his official capacity, receive federal financial assistance. As such, both Defendants are entities covered by Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

183.    Section 504 requires that each covered entity provide all individuals with disabilities, including children, with reasonable accommodations and modifications.

184.    Plaintiffs re-assert that items listed above in Counts I and II are fully incorporated herein, and such failures as noted above, have, together and separately, contributed to violating J.H.'s rights pursuant to Section 504 and the federal rules and regulations promulgated pursuant thereto, upon which J.H. seeks recovery accordingly.

185.    In regard to all the above, J.H. was a victim of intentional discrimination solely based upon his disability and injured thereby.

**Count IV:    Physical Condition-Based Discrimination in Violation of Article I § 12 of the Louisiana State Constitution, Against All Defendants**

186.    Plaintiffs incorporate and reallege the allegations in each preceding and following paragraph of this complaint.

187.    The actions of the Defendants described herein were done with negligence, gross negligence and/or intentional and were arbitrary, capricious, and unreasonable, in violation of Louisiana constitutional law.

188.    The actions of the Defendants described herein resulted in the deprivation of J.H.'s right to be free from arbitrary, capricious, or unreasonable discrimination based on physical condition.

189.    J.H.'s disabilities qualify as physical conditions because those disabilities limit his major life activities, including learning, thinking, concentrating, interacting with others, controlling his emotions, and communicating.

190.    Defendant School Board arbitrarily, capriciously, and unreasonably discriminated against J.H.'s physical condition when Doyle and CT Janet Administrators chose to

call 911 dispatch rather than using de-escalation and intervention techniques commensurate with J.H.'s physical and emotional needs.

191.   Defendant Lopinto, in his official capacity, arbitrarily, capriciously, and unreasonably discriminated against J.H.'s physical condition when the officers collectively chose to put J.H. in a chokehold and arrest him rather than reasonably modifying their practices by using de-escalation and intervention techniques.

192.   In regard to all the above, J.H. was a victim of arbitrary, capricious, and unreasonable physical condition discrimination solely based upon his disability and injured thereby.

**Count V:       Intentional Infliction of Emotional Distress, Against All Defendants**

193.   Plaintiffs incorporate and reallege the allegations in each proceeding and following paragraph of this complaint.

194.   Defendants are vicariously liable for the actions of their employees.

195.   Because of J.H.'s age and disabilities, Defendants were aware that he was susceptible to emotional distress.

196.   As a direct and proximate result of the intentional acts of the Defendants described above, J.H. suffered extreme emotional distress, and continues to suffer from shock, distress, anguish, humiliation, and loss of enjoyment of life.

197.   J.H.'s emotional injuries were caused by Defendants' intentional acts.

198.   Defendants' acts and omissions were extreme and outrageous, malicious, and done with the specific intent to harm J.H. and/or with reckless disregard for the consequences of their acts and omissions.

**Count VI:       Negligent Infliction of Emotional Distress, Against All Defendants**

199.    Plaintiffs incorporate and reallege the allegations in each proceeding and following paragraph of this complaint.

200.    Each Defendant owed a duty of care to J.H. to act reasonably under the circumstances.

201.    Defendant School Board failed to attempt measures to de-escalate J.H.'s behavior.

202.    Defendant Lopinto, in his official capacity, did not employ proportionate action. Instead, the responding officers immediately resorted to force, making no attempt to de-escalate the situation, even as it was clear that J.H. was a small, unarmed child who was experiencing a crisis.

203.    Defendants' acts and omissions breached their duty of care to J.H., which resulted in harm to J.H.

204.    As a direct and proximate result of the negligent acts of the Defendants described above, J.H. suffered physical injury and emotional distress; moreover, he continues to suffer from these injuries and from shock, distress, anguish, humiliation, and loss of enjoyment of life.

205.    J.H.'s injuries were caused wholly by the negligent acts of the Defendants, who acted with reckless disregard for the consequences of their acts and omissions.

## VII.   <u>CAUSATION</u>

206.    The actions of the Defendants as described herein were the proximate cause of the injuries and damages suffered by Plaintiffs and to J.H.

207.    The Defendants are jointly and severally liable for the wrongs complained of herein, either by virtue of direct participation or by virtue of encouraging, aiding, abetting,

conspiring, committing and/or ratifying or condoning the commission of the above-described acts.

208.   The actions of the Defendants described herein were negligent, grossly negligent, intentional, arbitrary, capricious, and unreasonable and/or deliberately indifferent.

209.   The actions and omissions of the Defendants as described herein were intentional, malicious, reckless, and performed with malice, entitling the Plaintiffs and J.H. to a substantial award of punitive damages.

### VIII.   <u>JURY DEMAND</u>

210.   Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury in this action. In accordance with the Federal Rules, this jury demand is being filed with the Clerk of the United States District Court for the Eastern District of Louisiana.

### IX.   <u>PRAYER FOR RELIEF</u>

a.   WHEREFORE, Plaintiffs pray that, after due proceedings, there be judgment in their behalf and against all Defendants, jointly and severally, as follows: Issuing a declaratory judgment, pursuant to 28 U.S.C. §§ 2201 and 2202 and Federal Rules of Civil Procedure Rule 57, declaring that Defendants' operation of an emergency response program that dispatched and provided an inadequate and harmful response to individuals with disabilities is illegal as described above, in that it constitutes a violation of Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12132, and section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 794.

b.  Granting Plaintiffs permanent injunctive relief requiring Defendants, their agents, employees, and those persons acting in concert with them to operate a program that does not discriminate against people with disabilities and provides adequate and appropriate responses to individuals with disabilities.

c.  Awarding compensatory and punitive damages.

d.  Awarding reasonable attorneys' fees and all costs of these proceedings pursuant to 42 U.S.C. § 1988.

e.  Awarding judicial interest from the date of judicial demand.

f.  Declaring that the acts complained of herein were violations of Louisiana state law.

g.  Awarding all other relief which this honorable Court deems proper.

Plaintiffs further reserve the right to notice of defect to this pleading and reserve the right to amend or supplement this complaint after discovery of any additional fact, law, or claim, the amendment of which to be performed by the filing of any subsequent pleading.

Respectfully submitted,

TULANE LAW CLINIC
6329 Freret Street
New Orleans, LA 70118
504-865-5153
504-862-8753 (fax)

By:

M. LUCIA BLACKSHER RANIER, T.A.
Bar No. 26605
lblacksh@tulane.edu
504-862-8892

25

**/s/ Samuel T. Brandao**
SAMUEL T. BRANDAO
Bar No. 34456
sbrandao@tulane.edu
504-865-5987
*Supervising Attorneys*

And

Nora Ahmed* [*PHV*]
ACLU Foundation of Louisiana
P.O. Box 56157
New Orleans, LA 70156
Phone: 504-522-0628
Fax: 504-613-6511
nahmed@laaclu.org
justicelab@laaclu.org
*Admitted to the New York Bar,
not admitted to the Louisiana Bar*